Good morning. May it please the Court, I'm Lawrence Padway for the appellant Richard Aguilar. Mr. Aguilar worked from 1985 to 2000 for NUMMI. Counsel, let me skip to what's on my mind so you can get it off. I am actually troubled by the district court decision. A lot of medical diagnoses happens just routinely. The doctor says you have a herniated disc or you have a low B12 level or you have any, just hundreds, maybe thousands of medical conditions. And they say based on my observation of it today and the way this medical condition develops, you must have had it for at least several months or at least several years. It's just the way medical diagnosis works. It takes a while to diagnose. Once you have your diagnosis, usually it explains things that went long before. So for that reason, I'm troubled by the district judge saying, well, since they didn't diagnose it until the end of January, you couldn't have had it at the beginning of December. However, our standard of review is it has to be clearly erroneous for us to do anything about it. And I do not quite see how to say it's clearly erroneous. My personal view might matter if it was de novo, but I don't understand how to use the clearly erroneous and get to your result. I think the simplest way to do that is in Nord v. Black and Decker. Which one? Nord v. Black and Decker. The Supreme Court said that we're not going to have a ‑‑ I can't remember if I've lost the phrase, but we're not going to rely on the treating physician. We're going to not have a treating physician role in ERISA, even though we have it in Social Security and the Ninth Circuit had it in REGULA. And we're going to credit doctors who are just doing chart reviews, let alone who have never even seen the patient. And those doctors are going to be credited just as much as somebody who has personal observation and contact with the patient. What's wrong with that? That's the opposite way. The treating physician in that case said disabled, and the chart review physician said not disabled. That's right. And now what we have is the trial court says, well, I reject Dr. Enos's opinion because he wasn't the treating physician at that time. And that is directly contrary to the principles of Nord v. Black and Decker. Well, I think in every physician case, you have to take it in the context of what the physician did and what he came up with. Automatically, Dr. Penner doesn't get believed just because he made a different diagnosis or any diagnosis. The part that concerned me is that this was some time after December 1st. What was the time, when did Dr. Penner first see your client? Dr. Kalin? Pardon? Dr. Kalin, the first doctor? No, the second. Dr. Enos, he started at Kaiser about three months into this, the February of 01. So, he comes in February of 01, and he says, you were disabled December 1. Now, I can, if he gives a good reason why he could make that determination, there's nothing in the Dr. Kalin's records or any other records to show what the situation was in December 1 or nearly about that situation. What is there that makes his testimony believable or something that can be relied upon when he sees no records, but he sees him three months later and says, on December 1, you're disabled? He can do it off the history. He has the history that he took from the patient. That's it. I've heard on December 1. That is a perfectly valid basis for a medical doctor, but I think you need to kind of look at this, if you look at this as a whole. Well, there are records. I was just wondering whether he saw the records of Dr. Kalin. I don't believe he did. There's no indication of that. I didn't see that he... I thought they were the same medical group. No. Dr. Enos is at Kaiser and Dr. Kalin is private. But I think what's, I think, you know, what you need to look at in this case is this is somebody who has 15 years in the same job. So this is not somebody who is just a flake. This is somebody who has a career in line production, is assembly work, medium to heavy duty work. He starts having panic attacks in November, and that's according to history that Dr. Kalin took. So he's having these attacks for about three weeks and still working before he sees Dr. Kalin on December 1. And then he goes and takes off work and they start with some antidepressants and so forth. So given, you know, if you kind of look at the whole overview, because, you know, depression is subjective. And, you know, the plan administrator wants objective evidence, and that's not going to be there. Well, it depends. A depressed mood, sadness is subjective. Depression, the DSM-IV category, actually there are quite a lot of measures. There are very stereotypical things that the patients say. There are. Did he say them? Well, yes. But in the DSM-IV, there are, you need five out of seven criteria. They know how to distinguish situational depression from the disease of depression. But the only criteria in DSM-IV that's objective in depression is weight loss, which doesn't have to accompany depression. And so what he has is he has depression, he has panic attacks. That's diagnosed by three different practitioners. So, you know, I don't think that the diagnosis... Those are often objective. The doctor just looks at the patient's knuckles during the examination. Okay. Okay. Well, I'm not sure from the plan administrator's, as I understand what the plan administrator wants, it's not an observation by the doctor, but they're looking for x-rays or... Well, can you refer us to something in the excerpts of record so that we can say what you want us to say, which is that the district judge made a clearly erroneous decision? Okay. Is there some... Why don't you help us? Okay. Just tell us the best thing in the excerpts that will show us the district court was clearly erroneous in its factual determination that the condition did not start December 1. All right. So I start on the excerpts at page 59 just to get a job description. It is line production, assembly worker, medium-heavy work. Then I go to Dr. Kalin's material, which is somewhat hard to read, but it's about page 200 in the records. Those of us who are PI lawyers read plenty of bad handwriting. Right. Just give me the number. I'll do the job. But here's... Page what? If I start on that page 200, what is that page? Page 190. I'd start on page 198. Okay. So what... 198. Okay. 192. 198. Tell us specifically. Okay. What... Can I finish? Sure. Tell us specifically what on that page supports your argument that the district court clearly erred. Okay. We start with the comment from the patient, I am having anxiety, I feel horrible and depressed. What was the date? This is December 1. Okay. Okay. So how does that show... Well, I'm just... Could I ask you a question? Sure. How does that show that the district court clearly erred in ruling that that was not a disability? Just saying that doesn't make it a disability. No. But that is... It's one of... You need to take several pieces together to reach the appropriate diagnosis and decision. This is Dr. Kalin's... Goodell. Goodell. 192? 198. Now, this is the first person that's on. Yes. And this doctor is a psychiatrist? Yes. And he does what test psychiatrists do. There's no indication he did an improper test? No. And he concludes that he's 65 slant 100 test score, and that indicates that there are mild symptoms. Well, I think mild is a little... It kind of depends on what you're talking about. No, no. It's not what I'm talking about. It's what the doctor's talking about. And the doctor says he administers his test. There's no indication that he's an improper physician. There's no indication he gave a bad test. There's no indication that he didn't do his work. And he says that there's a 65 slant 100 test score, which is, according to the test score, mild symptoms. And he doesn't give him a disabled slip. Now, that's what we have. Yes. But the same doctor, if you look at his 2002 report, which is at page 284, changes that score to 59 and has him disabled. And this is the man he's given the disability slips to starting on December 20th. 284? 284. So a 65 does not... Let us get to 284. Now, where on 284 are you reading? 284 is a page with a lot of discussion. Right. Well, under Remarks... Pardon me? Under the Remarks section, patient was first seen 12-1-0-0 in my office to 1-15-02. Are you on... I don't see where you're reading. Oh, down there. It has been regularly followed for ongoing depression, was transferred to Kaiser in year 2001. So where are the records between 12-1-0 and 1-15-02? Okay. But if I could just, before I answer that... Well, could you answer it first so I can follow? So if he says he's been regularly seen from 12-1-0-0 to 1-15-02, where are those records? Those are mostly the Kaiser records. Dr. Kaelin was not seeing him regularly during this time because the care was transferred to Kaiser. And Kaiser records are, I mean, Dr. Kaelin's records are back on... Following page 199, I think they go to about page 208. How many times did Dr. Kaelin see Mr. Aguilar? About 10 or 12. And we would know that from the disability slips that he did, which start on page 136. After 12-1-0-0, when was the next time Dr. Kaelin saw Mr. Aguilar? 12-20. Okay. And did he give him a disability slip at that time? Yes, that's the time that he was first asked to do a disability slip, so that's when he did one. And that's at page 136. Well, it said, yeah, it said, Mr. Aguilar is advised to be on medical leave. Is that what you're saying is a disability slip? Yes. Where is the determination of disability? Well, there's nothing on this slip. This is a slip for the employer. Right. Okay. So that's not a finding of disability. And when was the next time he saw him? Well, 12-27. Still no finding of disability. Okay. And then 1-11. So those are the disability slips that are there. But those are not findings of disability. Those are held up. I mean, that could be for flu, it could be for stomachache, headache, whatever. But it's not a finding of disability. No, and I agree. And you wouldn't expect there to be a diagnosis on there because it would invade the patient's privacy. What I would expect, actually, is two narrative written reports, one from Dr. Kalin and one from the subsequent psychiatrist explaining what the patient's condition is, what it was, what the, well, sometimes they call it SOAP symptoms, Objective Assessment Plan. Sometimes they call it diagnosis and prognosis. They have various systems they use so they don't forget something. And I would expect two narrative reports. Is there a narrative report that explains why we should think that the disability started December, beginning of December, and it's a plain error to say otherwise? Yes. We have 163 and 165. We have the two reports from the, we have a report from Dr. Rennert, who's a Kaiser psychiatrist, and from Dr. Enos, who's a Kaiser psychologist. Why don't you start with the first one at 153 that you mentioned? 163. 163. That's a letter. Right. That's a letter to the plan and... 163. The third paragraph, last sentence, it says that Mr. Engelar had a difficult, treatment-resistant case of panic disorder and depression. But that's not what Judge Kleinfeld was referring to as a narrative with the diagnosis, prognosis, treatment plan. Well, the, and then, okay. So that, well, the clinical notes, I think you need to, we would go back to... And that, well, 201 is the first diagnosis by Dr. Kalin. And then his chart notes follow, and, of course, they're not very legible, as I think... Can you read it? I mean, you probably know his handwriting by now because you've had the case a long time. Well... It's below where it says admission GAF 65. What does it say there? It says we'll start antidepressants return in four weeks. Now, if you, the mental status examination is on the preceding page, which is 200, page 200. And at that point, we've got... So does this mean that he was put on SSRIs at the beginning of December? Yes. It was prescribed Paxil on December 1st. And the exam on that date... Could you tell me where it says he was prescribed Paxil December 1st? Let's see. I believe that is 197. It's a prescription for Paxil and Trazodone. Paxil. Paxil. And what's the other one? And Trazodone. I can't... I don't know that one. How do you spell it? T-R-A-Z-A-D-O-N-E. And the exam which led to that prescription is on page 200. Motor activity is marked as hypoactive. And I think that is a disqualification from work. If your motor activity is hypoactive, you do not belong on an assembly line. He's also restless. Mood is depressed and anxious. Affect is labile, which is another, I think, which would also disqualify you from being on an assembly line. But was the judge clearly erroneous in determining otherwise? That's the point. Well, this is the mental status examination. This is the only evidence of what he was like on December 1st, which is the last day. And, I mean, hypoactive motor activity is... is not... You know, it's troubling to me, and it was probably troubling to the district judge. The ERISA plan just keeps asking and asking Dr. Kalin to send him a letter. And he just won't do it. He won't send a letter explaining what the problem was. It was troubling to me also because, you know, sometimes these doctors are not always cooperative. Anyone ever take his deposition? No. We did attempt to bring him in to testify, but the district court did not permit that. Because we did at least want him to try to... Sure, there's that procedure in ERISA cases. Right. But no deposition. It's definitely... I mean, it is a problem because, I mean, his notes are illegible, but instead of the plan saying, hey, we've got illegible notes, let's get them cleaned up, they said the notes are illegible. Well, one of the nice things about a lawsuit is you can make a doctor testify even if he doesn't care to be bothered. Yeah. And I think that's one of the very valid reasons to go to the Kaiser doctors and say, okay, you know, they're willing to write reports. And they did, and they talked to the plan. And they explained their findings. So I think... But I think there's another... But I think you can look just at the mental status examination. And if you credit that he has slowed motor activity and he's depressed, who wants him on an assembly line? He's just an accident waiting for a place to happen. The question is, does that compel a finding? Yes, it does, because it is undisputed evidence. Okay. Cancel. You're way over time. Yes. Thank you. Good morning, Your Honors. May it please the Court. My name is Krista Mitzel. And I'm here representing the Plan and Life Insurance Company of North America. I'd like to take my time to respond to several of Mr. Padway's points and then answer the Court's questions. The first most important point to bring up is that plaintiff must prove his disability. He must prove that as of the date he's got... Counsel, maybe you could skip to a question. Sure. Because I find myself just waiting for you to get done so I can ask my question. Sure. I don't think the district judge was right. My issue is the clearly erroneous standard based on, you know, we all, those of us who are PI lawyers especially, but really most of us have some familiarity with illnesses. And we all know it takes a while sometimes for the doctors to figure out what the problem is to diagnose, but then once they do, it explains things that are before the diagnosis that were previously unexplained. And there are a lot of conditions. They don't just happen overnight. Sure. They develop gradually. So based on the observations of the following at the end of January and February, I'm pretty confident the guy had a panic disorder and a serious clinical depression at the beginning of December. I'm wondering whether it's clearly erroneous to say otherwise. And that's where I need focus. Okay. I'd like to focus on Dr. Callan because he was the first doctor who saw... To me, Dr. Callan looks like he's just too lazy to respond. See, I disagree. Right. I think that doctors are very, very specific in what they include in their notes. And I believe that if Mr. Callan... You know, this isn't the first set of doctor's notes I've ever seen. Did you depose Dr. Callan? Well, it is not our obligation to prove disability. If Mr. Aguilar thought... It's kind of nice when you're the defense lawyer to prove the absence of it. Sure. You could have deposed him just as easily as plaintiff, right? Theoretically, we could have, but we saw in his notes there was no indication of disability. No indication of disability. If Dr. Callan had said... There's no indication of disability. It's just whether it's good enough. Well, he has to prove it's good enough. It's his burden to prove disability as of the date he stopped working. Dr. Callan had many opportunities to go back and state... We're not limited to Callan. Sure, we aren't. Let's take... You say sure we are? No, we aren't. There are other doctors that treated Mr. Aguilar. I mean, there are some medical conditions. For example, suppose he got a B12 test and his B12 is way below normal. It takes five to seven years for the liver to run short of its supply. Sure. So you know for sure when you have a low B12 in January that the guy had a low B12 a year ago. But under the clearly erroneous standard, the district court was allowed to look at all of the medical evidence and weigh the evidence and also evaluate the credibility of the evidence. And it was within the court's discretion to weigh that evidence under Kearney and decide that because Dr. Rennert had not reviewed any medical records and did not see Mr. Aguilar as of the date of disability, it was perfectly rational for them to weigh that in a different manner than... I don't understand why you'd have to see him the date of the disability. I mean, it's common for people not to even go to the doctor when they first become disabled because they think it will go away. And then they go to a doctor sometime later and the doctor says, my goodness, you've got this and this condition and you must have had it for a while. And that explains what your problems have been. Sure. But the doctor still has to connect the disability to a functionality. And they have to connect the disability to an inability, in this case, to perform any job within the NUMMI plan. And at a GAF of 65, that is mild symptoms. And that's still functioning. We know plenty of people who go to work and aren't particularly animated or motivated or interested in their job and they still have jobs. And the fact that the judge did not... That's sadness. Isn't it sad? But it's the truth. That's not mood disordered depression. And a GAF of 65 is mild symptoms. And Mr. Aguilar never attempted to return to work. So there was no need for the plan to ever look at another job for him because he never tried to come back to work. Okay. I understand that you don't think you have any burden. And it's true, the plaintiff has the burden of proof. Could you show us the best things in the excerpts that prove that he wasn't disabled at the beginning of December? Well, I think the number one document is Dr. Callen's report. I think Dr. Callen's report, if he had thought that Mr. Aguilar was disabled as of December 1, he would have said it. And if Mr. Callen and all the subsequent times we were asked, we asked him to provide... Did Dr. Callen ever say he wasn't? Well, of course not. But that's proving a negative. Counsel, counsel, I'm not playing with you here. I want to know, did Dr. Callen ever say he was not disabled December 1? No. But he never affirmatively said he was. So how can we guess what Dr. Callen was thinking? What is this disability? We're talking about whether he cannot do any job in the plant. Yes. And he has to be on December 1 and have an inability to do any job in the plant. Yes. And then Dr. Callen has this GAF score of 65, which apparently to him is a diagnostic tool to the condition. Yes. And then he says, based upon that score, he has mild symptoms. Yes. Now, mild symptoms, I take it your argument is, doesn't mean he can't do any job in... Exactly. A lot of us are stressed. A lot of us have anxiety. Counsel, did he get any medical testimony that a score of 65 means you can work? I don't know if there was affirmative testimony. In the district court level, they did admit the diagnostic manual that outlines all of the different medical and mental conditions and how those are scored, which is how we got to the analysis of what a GAF 65 means. It would be nice if you would depose Dr. Callen and he said what I meant by a 65 is he's not happy, but he can work. Sure. But in the case of... You're making that pitch, but we don't have expert testimony saying so. But in a RISA case, there isn't the need for expert testimony. I don't understand. I thought Dr. Callen said he had mild symptoms based on the 65. I believe he did in his December 1st report. But he didn't give them a disability slip. No. We're... You're interpreting his 65 as... The December 1 report is these check boxes here at 198? Yes, 198, I believe. Okay. 199 or 200. 201. 201. Okay. And can you... Could you go ahead and read that diagnosis at 201? Depressive. And I don't have my notes on this, but I believe it says... After years with this case, you must know this doctor's handwriting. Well, to be fair, I am stepping in on the appeal as the attorney who originally worked the case is no longer with our firm. That's too bad. It is too bad. Okay. I knew a doctor that used to purposely write like this, and I once asked him about it, and he said, because I want to get paid for the deposition.  Well, I don't believe so, because the rest of his thorough notes on the previous three pages talk about his depressive condition. They go through the analysis, as Your Honor discussed earlier. They gave him the GAF score of 65. Gave him two medications, Paxil, which a lot of people are able to work and take antidepressants. Is it saying mild here, or is that an inference from him writing 65 and the DSM-IV saying that's mild? I think the analysis was done based on the 65 GAF score and the DSM manual and how that analyzed the GAF score. So it's basically the lawyer applying the DSM-IV manual to the 65 that the doctor wrote Well, I think the plan is charged with interpreting the documents. I wasn't asking you what the argument for it is. I was asking you what the fact is. We can get to the argument. Is that what happened? I believe it's the presentation of the GAF score. What I'm trying to find out is did the doctor write M-I-L-D, or did he not? I don't believe he did. Thank you. So did the district court determine it was mild? The district court did review the GAF scores and the analysis presented by the DMS-IV manual and looked through the manual and admitted that under judicial notice as an expert document. Did the district court determine that the depression was mild? Well, the district court analyzed all of the records and found that the records did not establish a disability. Okay. I had a specific question. Did the district court make a determination based on the score of 65 that it was mild? I don't know if the district court specifically included mild in its order, but the fact that the district court analyzed all of the disability records and found that he was not disabled as of the date that he stopped working of December 1st and looked at the GAF score, to me, would indicate that he found the symptoms mild and that there was no indication that Mr. Aguilar had proven that he was disabled and unable to perform any job. Maybe you could explain to me. I got this information on 65 from your brief at page 27, and it says the GAF score of 65 recorded by Dr. Canlon on December 1, 2000, connotes only mild symptoms or difficulty in social or occupational functioning, but generally functioning fairly well. Where did you get that? That was from the DMS form manual that was submitted under judicial notice as part of the record. And if I could follow up, did the district court use that? Yes. Okay. And where do we find in the record where the district court used that? I have the transcript. I believe that was submitted under our supplement of record, the transcript from the hearing that was held with Judge White. And I can get the page numbers for you of where they discussed submitting that document. Did you submit supplemental excerpts in this case? Yes, we did. Do we have the relevant pages of the DSM form manual in our excerpts? I don't believe those were attached. I don't believe those were attached. Those were submitted to the district court judge, and he considered them in rendering his opinion. Do we just have to take your say-so in your brief for what they stand for? Well, we did submit the excerpt of record of the trial hearing before Judge White where the parties discussed and submitted the DMS form manual. I can look at the DSM form. I would be happy to submit a copy. I'd like to look at it in the excerpts of record. I apologize. That wasn't included, Your Honor. What page shows that the district court took judicial notice? I'm looking right now. If it's something that you're going to rely upon, it would be nice to include it in the excerpts of record, because otherwise we don't know what you're talking about. Okay. I'd be happy to submit a copy as well. It's on they begin the discussion on page five lines, page five, line five, and they start talking about the medical impairment, including the GAF score of 59, and then previously it was the GAF score of 65. I'm going to try to ---- I apologize. I didn't have this marked. I guess basically what the judge says is page 353 of the excerpt, is he makes an adverse credibility determination against Dr. Renner, the second treating physician. He says that because he didn't see the guy until two months later, he had no personal knowledge of what the man's condition was two months before and provided no other basis for reaching his conclusion about the date of disability. Is that the heart of it? Essentially, yes. And it was within the court's discretion to evaluate the evidence presented. And this relied on the DSM, but the judge didn't say it was relying on the DSM. Since the judge didn't specifically talk about the DSM, but it was part of the record and he did evaluate the entire record and all of the medical information submitted. I also think it's on page 27. Thank you. Your eyes are quicker than mine. Looking for where the court took judicial notice of the DSM. Oh, there it is. Yes. Thank you, Your Honor. Page 25, the discussion will be on? It's page 27. 27, excuse me. Lines 3 through the end of the page. 919. It will be admitted and received by the court. And Mr. Padway, in lines 24 through 25 on to the next page, even admits that a score discussed in this case is an average function in the context. It's so much more satisfactory, instead of reading lawyers saying it's kind of, pretty much of a Gestalt average function, to actually look at the DSM. Well, if Your Honors would like me to submit a copy of the DSM. The point is you should have submitted it. If this was going to be part of your argument, you should have submitted it with your brief. I apologize for the omission. Another lawyer says it could be disabled. If that's the score, it could be disabled and not be disabled. I have nothing to say. We don't know what the DSM says from this. No one quotes it as far as I can tell. Are there any other questions I can answer? If I were to go to Borders and buy a copy of the DSM-IV, take it home and study it, would that be the right thing to do or the wrong thing to do? Well, the district court did review those documents, and since the basis for their decision included a review of the DSM manual, I believe that your review of this case is based on the district court's decision and what's contained in the record, and if the district court found the wane of the credibility of the evidence. Well, I can't use the manual, then, because it's not in the record. Well, theoretically I can. Smart lawyers get things in the record. Again, I apologize for it not being in the record, but if you'd like it to be submitted, it was considered by Justice White and Schwarzer. You didn't answer my question. Can I go out and buy a DSM-IV manual? I mean, they're for sale. Can I go out and buy one and use it? Theoretically, sure. I mean, the district court judge considered it. We don't even know what pages were considered by the district court judge, what language, so you would have to scour the DSM from cover to cover to determine what you presented and what the district judge considered? Theoretically, we don't know exactly what the district court presented, but even without the district court, the district court was within its discretion to determine that there was no evidence of a disability as of December 1. How do I know 165 is mild? In order to know 165 is mild, which is the basis for your argument that there's no evidence of disability when Dr. Kalin first sees him, I have to go with what you say the DSM-IV manual says, but I can't look at the DSM-IV manual and see if it really says that. Well, it is not included in the record, no. So how do I know it's mild? But all the parties, including Mr. Aguilar's counsel, stipulated to its inclusion. Okay. Show me where the parties stipulated that 165 is mild. I think it's 65. 65. 65. It's on page 27 at the end. Hold on. I'm not up to you. Page 27. Lines 24 and 25 on to the next page. That's the kind of pretty much of a gestalt average function discussion? To me, average function, in the context of this case, connotes mild. Where's the stipulation? Oh, you're saying kind of pretty much of a gestalt average function connotes mild. Sure. Is there any place where the lawyer stipulated that this GFF, GAF score is classified by the DSM-IV manual as mild? I don't believe they did. But the discussion and the context of this discussion. Is the word mild? Has any doctor said it? Does anything in the record say it? Or do we just have to rely on you saying it? I think you can rely on me and the context of the record and all the medical documents, none of which ever say he was disabled as of December 1st. That's what I wanted to know. Thank you. Any other questions?  Thank you. Thank you, counsel. Thank you. Recognizing that I'm over my time, I wonder if I might briefly respond. Take 30 seconds to a minute. The district court found that the plaintiff can show evidence of disability under the plan as of December 20th, 2000. That's accepting Dr. Kalin's disability notes. And that's at page 353 of the excerpts, page 8, line 27 of the district court opinion. So the real issue is, does it make a difference if he's disabled as of December 20th or December 1st? Of course it does. Well. December 1st is the operative date. I would disagree with that. I think that the fundamental mistake is in having an overly strict construction of the active service rule. Because under the trial court's definition, if you went home sick for a day and you weren't paid for that day off, then you'd be uninsured. Did you make this argument in the district court? No. We did talk about the active service rule. I would need a little bit of time to find where we made the argument in the district court. Did you make it in your brief? Yes. We did make it in the brief. The issue is that one of the things that determines whether or not you're in active service is whether or not he was paid for the time off from December 1st to December 20th. And that's not in the administrative record because it wasn't an issue in the administrative proceedings. Where is this argument made in your blue brief? Let's see. Page 25. It says applying the active service rule in this context leads to an unconscionable result. Yes. But that's a different argument than you're making now. I don't think it is. I think the question is the interpretation of the active service rule, which is a substantial part of our brief. It's the third issue that we raised. Is it unconscionable for Mr. Aguilar to lose a lifetime of disability benefits because he claimed to date his disability three weeks earlier than the court determined he was disabled? Okay. That's a different argument. That's fine. But I think, you know, this is, these are disability benefits. This is a safety net. People are entitled, if this was an insurance policy, which it is, but if this was a non-insurance policy, we'd say what are the reasonable expectations of the insured? Counsel, did you represent Mr. Aguilar in the district court? Yes. Did you agree that the GAF score of 65 was mild? No. Do you agree today that it's mild? Not in the sense in which it's being argued. The DSM. If we looked at the DSM and looked under 65 and went across the grid, what would it show? It would show basically there's about a page or two of text that goes with that, and it would, and if you read that, you would conclude that that might be disabling, it might not be disabling. It's not really the relevant item, because the GAF score is an average. And the ability to work in this case is based on panic attacks, which is not an average function. They don't have a number, like a range, 59 to so-and-so is moderate, mild, or, that's what I'm asking you. They do have a range, and as you get lower, as you get closer to zero, it's more severe, but it's not, what I'm saying is it's not that simple that you can say, oh, 65, you can work, 80, you can work, you know, 40, you can't work, because the GAF is an average kind of functioning, and a score between 50 and 60 is not disabling. So, 50 to 75, I think is how they break it down, by quartiles, and all of his scores, even when he's at Kaiser, the lowest score he has is a 50 when he's disabled. So, 50 to 75 on this record is in a disabling range. If you look at the DSM manual by itself. There's no argument in district court that the GAF score indicated disabling. Well, we told the district court is exactly what I'm telling you, which is that it's not particularly the relevant item because of its average nature. Okay. All right. But we were the ones who offered it to the district court. You are out of time. Thank you. Thank you, counsel. Aguilar v. New United is submitted. We are adjourned for the day. Thank you.
judges: Wallace, Kleinfeld, Rawlinson